Cynthia MORICONI, Individually and on behalf of All Others Similarly Situated, Plaintiff,

v.

AT & T WIRELESS PCS, LLC d/b/a AT & T Wireless, Defendant.

No. 4:03–CV–00344 GTE.

United States District Court,
E.D. Arkansas,
Western Division.

Aug. 19, 2003.

Brian G. Brooks, Susan Nichols, Brian David Reddick, Christine Connely Althoff,

Wilkes & McHugh, P.A., Little Rock, AR, for plaintiff.

Steven W. Quattlebaum, E.B. Chiles, IV, Patrick William McAlpine, Quattlebaum, Grooms, Tull & Burrow PLLC, Little Rock, AR, for defendant.

### MEMORANDUM OPINION AND ORDER

EISELE, District Judge.

Before the Court is Plaintiff's Motion to Remand (Docket # 4). Plaintiff seeks to remand this action back to the state court from which it was removed. Over Defendant's objection, the Court finds that it lacks subject matter jurisdiction in this case, and the case must therefore be remanded.

## I. PROCEDURAL BACKGROUND

Plaintiff Cynthia Moriconi, acting individually and on behalf of other similarly situated individuals, originally filed suit on March 20, 2003, in the Circuit Court of Pulaski County, Arkansas. On May 14, 2003, Defendant AT & T Wireless PCS, LLC d/b/a AT & T Wireless ("AT & T") filed a Notice of Removal, resulting in the removal of this case to federal court and assignment to the undersigned judge. Plaintiff's Motion to Remand shortly followed.

AT & T contends that this Court has the power to hear this case based on both federal question and diversity jurisdiction. 28 U.S.C. §§ 1331, 1332. Although Plaintiff raises what are represented to be solely state law claims, AT & T contends the claims are, in fact, claims arising under federal law due to the preemptive effect of the Federal Communications Act ("FCA"), 47 U.S.C. § 151 *et seq.* Plaintiff disagrees, contending that her state law claims are cognizable notwithstanding the FCA. AT & T further contends that there is complete diversity of citizenship and the matter in controversy exceeds $75,000, ex-clusive of interest and costs. Plaintiff disputes that the jurisdictional amount is satisfied.

## II. THE COMPLAINT

Plaintiff, a consumer of wireless telephone services, purporting to represent herself and other similarly situated wireless customers (hereinafter referred to as "Class Members") challenges certain of Defendant's business practices and the written contract establishing the terms and conditions of the service relationship. Plaintiff's contentions, the specifics of which are outlined in an eighteen page complaint, may be grouped into two broad areas.

First, Plaintiff challenges the manner in which Defendant markets and advertises its wireless services and its charges for such services. As described in the opening paragraphs of Plaintiff's Complaint:

2. ... [Defendant's] calling plans typically include a flat monthly access/service fee together with either a set number of air-time minutes each month for wireless calls, or provide that air-time will be billed based upon the amount used within a given billing cycle. However, these calling plans uniformly failed to disclose applicable fees and charges, billing and sales practices, service limitations, and other short comings of Defendant's wireless phone network clearly and conspicuously. ...

3. In fact, the marketing and business and billing practices for these calling plans have consistently misrepresented or failed to disclose, and repeatedly omitted, common material facts necessary to reasonably apprise Plaintiff and other similarly-situated consumers of the material effect of certain billing practices (including the financial consequences of those billing practices on the effective rates charges), and the geo-

graphical limitations and other deficiencies with respect to the wireless phone service actually provided, which has caused consumers to pay higher monthly wireless phone charges and fees, and receive lesser quality service than that reflected in Defendant's marketing and as agreed in the underlying customer service agreements.

4. Ms. Moriconi files this class action on behalf of herself and other consumers to obtain restitution and damages from Defendant resulting from Defendant's deceptive, unfair, and unconscionable practices and to enjoin Defendant from further misrepresenting its calling plans to herself and others.

(Complaint at pp. 1–3).

The remainder of the Complaint is consistent with this initial description. Plaintiff complains that Defendant misrepresents to its wireless telephone customers in a similar fashion the quality of the service provided and the manner in which consumers will be charged for such services.

Second, Plaintiff complains that all consumers of AT & T's wireless customers are subjected to pre-printed, non-negotiable, "patently adhesive," "Terms and Conditions" which impose unfair terms and limitations. Among the challenged "Terms and Conditions" are AT & T's attempt to use the contract to limit its liability, the allowance of unilateral changes to material contract terms, and the imposition of mandatory arbitration to resolve disputes. Plaintiff requests a declaration that the limitations on liability and mandatory arbitration provisions contained in the written contract between AT & T and Class Members are "unfair, unconscionable, and otherwise unlawful and unenforceable." (Complaint at ¶ 75).

Plaintiff alleges four causes of action: (1) declaratory relief seeking the declaration of the contractual and other legal rights of the parties, pursuant to Ark.Code Ann. § 16–111–104; (2) an equitable claim for restitution of monies received based upon AT & T's failure to adequately disclose the material terms and limitations of its calling plans; (3) actual damages and attorneys' fees for violation of the Arkansas Deceptive and Unconscionable Trade Practices Act, Ark.Code Ann. § 4–88–101 *et seq.;* and (4) actual damages and attorneys' fees for violation of Arkansas' Deceptive Advertising statute, Ark.Code Ann. § 4–88–108.

## III. REMOVAL AND REMAND

Any civil action brought in state court which alleges claims within the original jurisdiction of the United States District Courts may be removed by the defendant to the appropriate federal court. 28 U.S.C. §§ 1441(a). Once a case has been removed to federal court, a motion to remand to state court may be brought on the basis of any defect in the removal procedure. 28 U.S.C. §§ 1447(c). If it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. 28 U.S.C. §§ 1447(c).

In reviewing a motion to remand, the court must resolve all doubts in favor of a remand to state court, and the party opposing remand has the burden of establishing federal jurisdiction by a preponderance of the evidence. *In re Business Men's Assurance Co. of America,* 992 F.2d 181, 183 (8th Cir.1993)(citing *Steel Valley Auth. v. Union Switch & Signal Div.,* 809 F.2d 1006, 1010 (3rd Cir.1987), *cert. dismissed* 484 U.S. 1021, 108 S.Ct. 739, 98 L.Ed.2d 756 (1988)).

The Court must decide whether Plaintiff's claims are within the original jurisdiction of this Court. AT & T contends that the Court has subject matter jurisdiction, either on federal question or diversity grounds. 28 U.S.C. §§ 1331, 1332. These

alternative theories for jurisdiction are discussed separately below.

## IV. FEDERAL QUESTION JURISDICTION

A civil action filed in a state court may be removed to federal court if the claim is one "arising under" federal law. 28 U.S.C. § 1441(b). The Court has original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

■ Determining when a suit "arises under" a federal law is customarily determined by applying the well-pleaded complaint rule "which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). Because the plaintiff is considered the master of his complaint, he may elect to avoid federal removal jurisdiction by relying solely on state law. *Id.* "Congress has long since decided that federal defenses do not provide a basis for removal." *Id.* at 399, 482 U.S. 386, 107 S.Ct. 2425, 96 L.Ed.2d 318. "Thus, a case may not be removed to federal court on the basis of a defense, even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 475, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998)(internal quotations omitted).

■ Limited exceptions to the well-pleaded complaint rule have been recognized. Recently, the Supreme Court characterized these exceptions as follows: "a state claim may be removed to federal court in only two circumstances—when Congress expressly so provides, such as in the Price–Anderson Act[1] ..., or when a federal statute wholly displaces the state-law cause of action through complete preemption." *Beneficial Nat. Bank v. Anderson*, — U.S. —, —, 123 S.Ct. 2058, 2063, 156 L.Ed.2d 1 (June 2, 2003)("As a general rule, absent diversity jurisdiction, a case will not be removable if the complaint does not affirmatively allege a federal claim.")

Despite the omission of any federal claim in Plaintiff's Complaint, Defendant contends that federal question jurisdiction exists in this case for two independent reasons. First, Defendant contends that Plaintiff's state law claims are completely preempted by the Federal Communications Act.[2] Second, Defendant contends based on the "substantial federal question" doctrine that the real nature of Plaintiff's complaint is federal, and thus, that a federal question exists. The Court rejects both contentions.

### A. Complete Preemption

Complete preemption applies in circumstances where certain federal statutes are deemed to possess "extraordinary preemptive power, a conclusion courts reach reluctantly." *Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536, 543 (8th Cir.1996)(internal quotation omitted). "Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim,

**1.** The Price–Anderson Act, in addition to providing federal courts with jurisdiction over tort actions arising out of nuclear accidents, contains an express provision permitting the removal of such actions from state court even when the action asserts only state-law claims. 42 U.S.C. § 2014(hh). *See* discussion in *Ben-*

*eficial Nat. Bank*, — U.S. at —, 123 S.Ct. at 2062.

**2.** The Federal Communications Act of 1934, as amended (codified at 47 U.S.C. § 151 *et seq.*).

and therefore arises under federal law." *Caterpillar,* 482 U.S. at 393, 107 S.Ct. 2425, 96 L.Ed.2d 318.

At the outset, it is useful to distinguish conflict, or defensive, preemption from complete preemption. The concepts are distinct. Conflict preemption does not in itself provide for federal question jurisdiction because there is no showing that Congress has intended to create the sole mechanism for enforcement of the federal right. *See Rice v. Panchal,* 65 F.3d 637 (7th Cir.1995)(Federal preemption that merely serves as a defense to state law causes of action, referred to as "conflict preemption," does not confer federal question jurisdiction.). Instead, state law is preempted only to the extent of an actual conflict between state and federal law. A good example of conflict preemption is the Federal Cigarette Labeling and Advertising Act, which has been found to preempt state law tort claims to the extent that such claims allege claims concerning the inadequacy of warnings or the propriety of cigarette advertising. *See, e.g., Cipollone v. Liggett Group, Inc.,* 789 F.2d 181 (3d Cir.1986), *cert. denied,* 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987).

Similarly, applying conflict preemption to Plaintiff and the Class Members' claims in this case might result in certain claims being preempted, but only to the extent that such claims are found to interfere or conflict with areas regulated by the FCA. Most importantly for the present analysis, conflict preemption would not transform Plaintiff's state law claims into federal claims. It might provide a defense to some or all of Plaintiff's state law theories of recovery, but such defenses would not provide a basis for this Court to exercise federal question jurisdiction.

■ Complete preemption applies only if there is a finding that Congress intended to provide an exclusive federal remedy for a particular claim. When complete pre-emption applies, a federal question exists whether a plaintiff characterizes her claims as federal or state. A plaintiff then cannot avoid federal jurisdiction by characterizing her claims only as state law claims. Under the "artful pleading doctrine," the state law claims are re-characterized as federal claims, and removal is proper based on the theory that plaintiff's claim is actually federal, regardless of how it is pled. *See Rivet v. Regions Bank of Louisiana,* 522 U.S. 470, 475–76, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998).

The Supreme Court recently considered the doctrine of complete preemption in *Beneficial Nat. Bank v. Anderson, supra,* holding that because the National Bank Act provides an exclusively federal cause of action for usury claims against national banks, such causes of action are necessarily federal, arise under federal law, and are removable. —— U.S. at ——, 123 S.Ct. at 2063. The Court noted that it previously had found complete preemption in connection with the Labor Management Relations Act and the Employee Retirement Income Security Act, and that in both instances "the federal statutes at issue provided the exclusive cause of action for the claim asserted and also set forth procedures and remedies governing that cause of action." *Id.* It thus declared that "[o]nly if Congress intended § 86 [which provides for a usury claim against national banks] to provide the exclusive cause of action for usury claims against national banks" could the statute be comparable to other federal statutes declared by the Court as completely preempting state law. *Id.* at 2064.

■ Defendant points out, and the Court agrees, that *Beneficial* makes clear that in evaluating congressional intent it is not necessary to find that Congress intended the cause of action to be removable. Such an approach is a semantic departure from prior case law instructing courts

faced with a complete preemption argument to "determine whether Congress has clearly manifested an intent to make a cause of action pleaded under state law removable to federal court, mindful that in the ordinary case federal preemption is merely a defense to a plaintiff's lawsuit." *See Magee v. Exxon Corp.*, 135 F.3d 599, 602 (8th Cir.1998)(internal citations omitted). This Court does not, however, read *Beneficial* as lowering the bar for a finding of complete preemption. Such a finding is still the exception rather than the rule and requires a statute with "unusually powerful pre-emptive force." *Beneficial*, —— U.S. at ——, 123 S.Ct. at 2062 (quotation marks omitted).

Thus, in evaluating congressional intent to answer the complete preemption question presented in this case, the Court focuses on whether Congress intended for the FCA to provide an exclusively federal cause of action against commercial wireless providers such that there effectively is no cognizable state-law claims or causes of action in this area.

## THE FEDERAL COMMUNICATIONS ACT

The FCA governs and regulates communication by wire and radio. Defendant relies upon a portion of the statute governing commercial mobile service providers such as AT & T Wireless, and more particularly upon a section of the statute expressly prohibiting states from regulating "the entry of or the rates charged by any commercial mobile service." 47 U.S.C. § 332(c)(3)(A). The provision provides in pertinent part:

(3) State Preemption. (A) Notwithstanding sections 2(b) and 221(b) [47 U.S.C. §§ 152(b) and 221(b) ], no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of mobile services. Nothing in this subparagraph shall exempt providers of commercial mobile services (where such services are a substitute for land line telephone exchange service for a substantial portion of the communications within such State) from requirements imposed by a State commission on all providers of telecommunications services necessary to ensure the universal availability of telecommunications service at affordable rates. Notwithstanding the first sentence of this subparagraph, a State may petition the Commission for authority to regulate the rates for any commercial mobile service

. . .

47 U.S.C. § 332(c)(3)(A).

Congressional intent regarding the appropriate division of the regulatory authority of federal and state governments under the FCA is reflected by the following House of Representatives' report:

Section 332(c)(3) provides that state or local governments cannot impose rate or entry regulation on private land mobile service or commercial mobile services; this paragraph further stipulates that nothing here shall preclude a state from regulating the other terms and conditions of commercial mobile services. It is the intent of the Committee that the states still would be able to regulate the terms and conditions of these services. By "terms and conditions," the Committee intends to include such matters as customer billing information and practices and billing disputes and other consumer protection matters; facilities citing issues (e.g. zoning); transfers of control; the bundling of services and equipment; and the requirement that carriers make capacity available on a wholesale basis or such other matters as fall within a state's lawful authority.

This list is intended to be illustrative only and not meant to preclude other matters generally understood to fall under "terms and conditions."

H.R.Rep. No. 103–111 (1993), reprinted in 1993 U.S.C.C.A.N. 378, 588.

■ That Congress intended for States to retain some authority to regulate and hear claims concerning commercial mobile service providers is clear from § 332's statutory language and legislative history. The statutory preemption portion of § 332 prohibits states from regulating "the entry of or the rate charged" by commercial mobile service providers, but limits the restriction to the topics noted, pointing out that the paragraph "shall not prohibit a State from regulating the other terms and conditions of mobile service." § 332(c)(3)(A). The statute even contemplates that states may be granted permission to regulate rates. And the legislative history supports the finding that Congress specifically intended to reserve for states the right to regulate and resolve such matters as customer billing information and practices and billing disputes and other consumer protection matters.

Finally, the FCA contains a savings clause which provides:

Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.

47 U.S.C. § 414.

To resolve the complete preemption issue before it, this Court must examine the statutory scheme to determine whether Congress intended by providing in the FCA an exclusively federal cause of action against commercial mobile service providers with regard to rates and market entry to displace all state law actions. The FCA provides aggrieved consumers with a cause of action in federal district court to challenge damages caused by a wireless pro-vider's unreasonable rates or inadequate service. *See, e.g.,* 47 U.S.C. § 207. The FCA fails, however, to provide aggrieved consumers of wireless services with any federal remedies for deceptive advertisement or billing. The statutory language, the legislative history, and the savings clause compel the conclusion that Congress envisioned that consumers would not be deprived of their state law causes of action for consumer related fraud.

For its argument, Defendant relies primarily on a Seventh Circuit case, *Bastien v. AT & T Wireless Services, Inc.,* 205 F.3d 983 (7th Cir.2000). In *Bastien,* the court found complete preemption in the context of a state law challenge to the quality of AT & T's cellular service and tower construction policies. The case, initially filed in state court, alleged only state law claims for breach of contract and consumer fraud based on the unsatisfactory quality of AT & T's cellular telephone service, resulting in a high volume of unsuccessful and dropped calls. The plaintiff in *Bastien* specifically alleged the inferior service was the result of AT & T signing up cellular subscribers prior to establishing an adequate cellular tower and network infrastructure to service those subscribers. *Id.* at 985.

In affirming the district court's denial of the remand motion, the Seventh Circuit interpreted 47 U.S.C. § 332(c)(3)(A) as creating "separate spheres of responsibility, one exclusively federal and the other allowing concurrent federal and state regulation." *Bastien,* 205 F.3d at 987. The court went on to find complete preemption with respect to the exclusively federal sphere, which applies to cases involving, in the statutory language, "the entry of or the rates charged by any commercial mobile service or any private mobile service." 47 U.S.C. § 332(c)(3)(A). States remain free to regulate "other terms and condi-

tions" of mobile telephone service. *Id.; Bastien,* 205 F.3d at 987.

The *Bastien* court found that the plaintiff's claims "tread directly on the very areas reserved to the FCC: the modes and conditions under which AT & T Wireless may begin offering service in the Chicago market." *Bastien,* 205 F.3d at 989. The court distinguished the complaint before it from one filed in a Sixth Circuit case, *Long Distance Telecommunications Litig.,* 831 F.2d 627, 633–34 (6th Cir.1987). The Sixth Circuit case involved state law claims against a long-distance service provider for fraud and deceit for failing to tell customers of the provider's practice of charging for uncompleted calls. The Sixth Circuit had reasoned that the purpose of preemption was "to achieve nationwide uniformity in telecommunications regulation." *Bastien,* 205 F.3d at 989 (discussing *Long Distance Litigation,* 831 F.2d at 633). "Because the claims for fraud and deceit would not have affected the federal regulation of the carriers at all, the [Sixth Circuit] court held that Congress could not have intended to preempt the claims." *Id.* at 988–89.

The Eighth Circuit has not considered whether the FCA completely preempts state law claims in the field of interstate wireless service telecommunications. A district court case, *State ex rel. v. Nextel West Corp.,* 248 F.Supp.2d 885 (E.D.Mo. 2003), rejected a cellular service provider's claim of complete preemption in the context of the attorney general's suit alleging that the provider fraudulently characterized rate increases as government mandated charges. The Missouri district court distinguished *Bastien* as involving a direct attack on "AT & T's rates and its right to enter the Chicago market." *Nextel West,* 248 F.Supp.2d at 892. In refusing to find that plaintiff's claims were "properly characterized as challenges to defendants' rates," the court found that the plaintiffs were challenging only "the defendants' allegedly deceptive description of their rates in invoices and advertising" further finding that the plaintiffs were not challenging the rates themselves or asking the state court "for any relief that would regulate the defendants' rates." *Id.*

In the context of wire-line carriers, the Second and Eleventh Circuits have rejected the argument that the FCA completely preempts state law claims for consumer fraud type violations. *See Marcus v. AT & T Corp.,* 138 F.3d 46, 54 (2nd Cir.1998)(noting that although the FCA "provides some causes of action for consumers, it provides none for deceptive advertising and billing"); *Smith v. GTE Corp.,* 236 F.3d 1292, 1312 (11th Cir.2001). *See also Nextel,* 248 F.Supp.2d at 891 (finding the "weight of authority holds that the FCA does not completely preempt state law claims" and citing cases). Defendant argues that many of these cases considered complete preemption in the context of wire-line providers, rather than in wireless carriers, to which § 332(c)(3)(A) is limited. While technically true, this does not mean that overwhelming authority declining to find complete preemption in the context of the FCA is completely without value. Like its wire-line provider counterparts, commercial mobile service providers are considered "common carriers," both of which are subject to the regulation of the Federal Communications Commission ("FCC") by Title II of the FCA. Moreover, if the purpose of applying complete preemption is to promote nationwide uniformity in the regulation of the telecommunications industry, as stated by the Sixth and Seventh Circuits in *Long Distance Telecommunications* and *Bastien, see* discussion *supra,* it makes sense to treat wire-line provider and commercial mobile service providers similarly with regard to the complete preemption issue, assuming of course, that Congress manifested a simi-

lar intent with regard to both. This Court does, however, recognize the distinction and relies only upon § 332(c)(3)(A), relevant legislative history, and cases construing the same in reaching its conclusions in this case.

■ The Court finds that § 332 of the FCA lacks the extraordinary preemptive power necessary to convert Plaintiff's state law challenges to Defendant's marketing and advertising practices into a federal claim. Moreover, even assuming that the complete preemption recognized by the Court in *Bastien* were appropriate, it would not compel a finding of complete preemption in this case. Here, the Plaintiff's state law claims do not, as in *Bastien*, present a direct challenge to either AT & T's rates or its entry into the wireless market. Defendant contends that Plaintiff has attempted to disguise her claims, which in fact pose indirect attacks on AT & T's rates. The Court disagrees.

The Complaint, on its face, does not contain a challenge to Defendant's rates or the nature of its wireless infrastructure, which determines the level of service it is able to provide. The essence of the allegations are that Defendants have not adequately disclosed their true "service fees, billing and sales practices, and service limitations." (Complaint at p. 1.) The Complaint specifically states that Plaintiff "does not contend that the rates charged by Defendant are unfair and unreasonable." Complaint at ¶ 83. To be sure, any challenge to a wireless service provider's practices, if successful, is likely to impact rates and the manner in which services are delivered, but this indirect result does not convert such challenges into a direct challenge to rates and market entry contemplated by the preemptive language of the statute.

Notably, the FCC considered the issue of whether § 332 generally preempts state courts from awarding monetary relief in *In re Wireless Consumers Alliance, Inc.*, 15 F.C.C.R. 17021, 2000 WL 1140570 (2000).[3] There the FCC noted its prior finding that the language and legislative history of § 332 did not support "the preemption of state contract or consumer fraud laws relating to the disclosure of rates and rate practices." *Id.*, 15 F.C.C.R. at 17028. The FCC went a step further, finding that the same statutory language and legislative history did not, as a general matter, prevent state courts from awarding damages to customers of commercial mobile radio service providers based on violations of state contract or consumer fraud laws. *Id.* at 17029. The FCC specifically rejected the argument of the carriers that the non-disclosure and fraud claims of the consumers were in fact disguised attacks on the reasonableness of the rate charged for the service, stating:

> A carrier may charge whatever price it wishes and provide the level of service it wishes, as long as it does not misrepresent either the price or the quality of service. Conversely, a carrier that is charging a "reasonable rate" for its services may still be subject to damages for a non-disclosure or false advertising claim under applicable state law if it misrepresents what those rates are or how they will apply, or if it fails to inform consumers of other reasonable terms, conditions, or limitations on the service it is providing. We thus do not agree with those commenters who allege that, for consumer protection claims, any damage award or damage calculation, including any refund or rebate, is necessarily a ruling on the reasonableness of

---

**3.** Significantly, here the FCC was considering the issue as one of conflict preemption, not complete preemption, thus providing further support for the Court's conclusion here.

the price or the functional equivalent of a retroactive rate adjustment.

*In re Wireless Consumers Alliance,* 15 F.C.C.R. at 17035–36.

Of course, the FCC was considering the preemption issue in the defensive posture, that is, the argument of mobile service providers that an award of damages to plaintiffs who prevailed in their state consumer protection, tort, or contract laws was preempted by § 332. It would be inconsistent indeed for this Court to hold that § 332 provides for complete preemption with respect to the consumer fraud and misrepresentation type challenges presented by Plaintiffs here when the FCC has refused to hold that similar challenges were conflict preempted.

For the reasons above stated, the Court rejects the argument that § 332 completely preempts the Plaintiff and putative Class Members' state law claims.

## B. *Substantial Federal Question*

■ Under the substantial federal question doctrine, federal court jurisdiction may be found to exist where the plaintiff's state law claim will require a federal court to decide or construe a substantial issue of federal law. To apply the doctrine, it must appear "that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims." *Franchise Tax Bd.,* 463 U.S. at 13, 103 S.Ct. 2841, 77 L.Ed.2d 420; *see, e.g., Smith v. Kansas City Title & Trust Co.,* 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921). The "mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Merrell Dow,* 478 U.S. at 813, 106 S.Ct. 3229, 92 L.Ed.2d 650.

Even if state law creates plaintiffs' causes of action, the case may still "arise under" the laws of the United States if a well-pleaded complaint establishes that plaintiffs' "right to relief under state law

requires resolution of a substantial question of federal law." *City of Chicago v. Int'l Coll. of Surgeons,* 522 U.S. 156, 164, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997) (quoting *Franchise Tax Bd. of State Of Cal. v. Constr. Laborers Vacation Trust For S. Cal.,* 463 U.S. 1, 13, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)) (case arises under federal law when federal law creates cause of action or plaintiff's right to relief necessarily depends on resolution of substantial question of federal law). In such a case, federal jurisdiction is based on "the presence of a federal issue in a state cause of action." *Merrell Dow Pharms., Inc., v. Thompson,* 478 U.S. 804, 810, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986).

Applying this doctrine, which appears relatively straightforward, has proven confusing. As the Supreme Court has acknowledged, applying the concept requires "principled, pragmatic distinctions" and "careful judgments about the exercise of federal judicial power." *Id.* at 813–14, 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650. Only where the "federal interest at stake" is substantial will federal jurisdiction lie. *Id.* at 814 n. 12, 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650. In short, the Court's teachings instruct lower courts to apply the substantial federal question doctrine with caution. *See, e.g., Almond v. Capital Properties, Inc.,* 212 F.3d 20, 23 (1st Cir.2000) (noting "[p]erhaps the best one could say is that [the substantial federal question doctrine] endures in principle but should be applied with caution and various qualifications").

■ Despite Defendant's best efforts to turn Plaintiff's Complaint into a challenge to rates and service quality, the Court does not agree with Defendant's characterization of the Complaint. The essence of Plaintiff's claims are that Defendant's misrepresented the quality of its service and what it would cost to obtain it.

These are alleged *misrepresentations* of the amount charged and quality of service provided, "not on the wrongfulness of the charge itself" or the inadequacy of the service provided. *In re Universal Serv. Fund,* 247 F.Supp.2d 1215, 1225 (D.Kan. 2002) (unfair competition claims were tied to claim of alleged misrepresentation and therefore did not challenge lawfulness of charges controlled by federal law; no substantial federal question).

No reference to federal law is required to determine the state law questions presented by Plaintiffs. *See e.g., Sanderson, Thompson, Ratledge & Zimny v. AWACS, Inc.,* 958 F.Supp. 947 (D.Del.1997) (claims that carrier did not accurately disclose billing practice not governed by FCA); *Bauchelle v. AT & T,* 989 F.Supp. 636 (D.N.J. 1997) (sections 201, 202 and 203 of the FCA do not apply to state law challenges to carrier's advertising and promotion practices); *In re Comcast Cellular Telecomm., Lit.,* 949 F.Supp. 1193 (E.D.Pa. 1996) (claims that carrier failed to accurately disclose billing practice not governed by FCA); *Weinberg v. Sprint Corp.,* 165 F.R.D. 431 (D.N.J.1996) (same).

The substantial federal question doctrine does not support the removal of this case to federal court.

## V. DIVERSITY OF CITIZENSHIP JURISDICTION

█ Original jurisdiction exists in the district courts in all civil actions where the matter in controversy exceeds the sum of $75,000 and is between citizens of different states. 28 U.S.C. § 1332. The party asserting federal jurisdiction has the burden of proof to show that the required amount in controversy is met. *Hatridge v. Aetna Casualty & Surety Co.,* 415 F.2d 809, 814 (8th Cir.1969). When the complaint does not allege a specific amount, the removing defendant must prove by a preponderance of the evidence that the amount in controversy meets the jurisdictional amount. *Trimble v. Asarco, Inc.* 232 F.3d 946, 959 (8th Cir.2000); *Gilmer v. Walt Disney Co.,* 915 F.Supp. 1001, 1007 (W.D.Ark.1996).

It is undisputed that complete diversity exists between the parties. Rather, the issue is whether the amount in controversy requirement is satisfied. Plaintiff affirmatively represents that the "damages, restitution, injunctive and other relief individually sought by Plaintiff and the class including their *pro rata* share of punitive damages or attorneys' fees awarded pursuant to this action, if any, is below the jurisdictional requirement" for federal diversity jurisdiction. (Complaint at ¶ 7).

█ As a general rule, where the plaintiffs in a class action suit have separate and distinct claims, each claim must satisfy the jurisdictional amount requirement for diversity jurisdiction. *Zahn v. International Paper Company,* 414 U.S. 291, 301, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973)(refusing to overrule *Snyder v. Harris,* 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319(1969)). Here, neither the Plaintiff nor any individual Class Member seeks or is entitled to individual damages in excess of the $75,000 threshold amount. Defendants implicitly concede this point, and instead focus their argument on the appropriate valuation of Plaintiff's claims for injunctive relief and the equitable remedy of disgorgement. Alternatively, Defendant proposes that Plaintiff's claim for disgorgement of proceeds collected by AT & T creates a common and undivided fund, which can be considered separately from individual damages recoveries for purposes of determining whether the jurisdictional amount can be satisfied.

### A. *Value of Injunctive Relief*

█ Defendant proposes that the value of the injunctive relief sought by Plaintiff and the costs incurred by Defendant be

considered. Defendant argues that the injunctive relief will require it to monitor and provide customers with detailed information regarding coverage, the cost of which will easily exceed $75,000.[4]

Plaintiff argues, and the Court agrees, that under existing Eighth Circuit precedent, "[t]he amount in controversy in a suit for injunctive relief is measured by the value to the plaintiff of the right sought to be enforced." *Burns v. Massachusetts Mutual Life Ins. Co.*, 820 F.2d 246, 248 (8th Cir.1987). Notwithstanding *Burns,* Defendant argues that, in fact, the Eighth Circuit would favor a more balanced approach and therefore, that aggregation is proper in this case given that Plaintiff seeks injunctive relief that will benefit the class as a whole. (Def.'s Br. at pp. 26–29).

It is the view of this Court that such an approach has been foreclosed by the Eighth Circuit, which *"requires* the district court to rely solely on the plaintiff's viewpoint in meeting the requisite amount." *Smith v. American States Preferred Ins. Co.*, 249 F.3d 812, 813 –814 (8th Cir.2001)(emphasis added). The Fifth Circuit, which also adheres to a plaintiff-perspective or viewpoint rule, recently found it inappropriate to consider the costs incurred by a defendant in complying with declaratory or injunctive relief. *See*

*Adams v. Nationwide Mut. Ins. Co.*, 2003 WL 21251734, *4 (N.D.Tex.2003).

The Court thus rejects the contention that it may consider the cost to Defendant of complying with the requested injunctive relief in evaluating the amount-in-controversy.

### B. Plaintiff's Disgorgement Claim Does Not Permit Aggregation

■ In an effort to avoid the general rule that the putative Class Members' claims cannot be aggregated to determine the amount in controversy, Defendant contends that Plaintiffs, by requesting "disgorgement of ill-gotten gains and restitution," have created a common and undivided interest in that portion of Defendant's profits, a sum that greatly exceeds the jurisdictional minimum of $75,000.

Although some courts have permitted aggregation of disgorgement or unjust enrichment claims, the majority of courts considering the issue have rejected it.[5] The cases allowing aggregation of disgorgement claims "rest their holdings upon the premise that disgorgement is a form of relief separate from, and independent of, individual damage recovery and that disgorgement 'would inure to the benefit of the class rather than vindicate any alleged violations of individual rights.'"

---

**4.** In support, Defendant submits the Declaration of Donald Jones, who opines that the cost of conducting systematic drive surveys in Arkansas, which would be required to provide more detailed information concerning its network coverage in Arkansas, would exceed $75,000.

**5.** *See e.g. Gibson v. Chrysler Corp.*, 261 F.3d 927 (9th Cir.2001) (finding that a disgorgement plea did not trigger the non-aggregation exception); *Morrison v. Allstate Indem. Co.*, 228 F.3d 1255 (11th Cir.2000) (finding same); *Gilman v. BHC Sec., Inc.*, 104 F.3d 1418 (2nd Cir.1997) (finding same); *Harris v. Physicians Mut. Ins. Co.*, 240 F.Supp.2d 715 (N.D.Ohio 2003) (finding same); *McCoy v. Erie Ins. Co.,*

147 F.Supp.2d 481 (S.D.W.Va.2001) (finding same); *Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft*, 54 F.Supp.2d 1042 (D.Kan.,1999)(*"Aetna I"*)(finding same); *Pierson v. Source Perrier S.A.*, 848 F.Supp. 1186 (E.D.Pa.1994) (finding same); *but see Durant v. Servicemaster Co.*, 147 F.Supp.2d 744 (E.D.Mich.2001) (finding that a plea for disgorgement allowed plaintiffs' claims to be aggregated); *In re Microsoft Corp. Antitrust Litig.*, 127 F.Supp.2d 702 (D.Md.2001) (finding same); *Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft*, 48 F.Supp.2d 37 (D.D.C. 1999) (*"Aetna II"*) (finding same); *In re Cardizem*, 90 F.Supp.2d at 826 (E.D.Mich.1999)(finding same).

*Microsoft,* 127 F.Supp.2d at 720 (*quoting Aetna II,* 48 F.Supp.2d at 41).

The Eighth Circuit has spoken on this issue. In *Crawford v. F. Hoffman–La Roche Ltd.,* 267 F.3d 760, 766 (8th Cir. 2001), the Eighth Circuit, relying on *Gilman, supra* at n. 4, rejected the argument that putative class members' claims for restitution of "all monies" overpaid created a common fund, the value of which could be used to satisfy the minimum jurisdictional amount. *Crawford* involved a purported class action against pharmaceutical companies alleged to have fixed the price of vitamins and vitamin supplements. In rejecting this argument, the Eight Circuit stated:

> "Under the classic 'common fund' cases, what controls is the nature of the right asserted, not whether successful vindication of the right will lead to a single pool of money that will be allocated among the plaintiffs." *Gilman,* 104 F.3d at 1427. The members of the prospective class did not hold joint title to any portion of the defendants' profits prior to the commencement of this lawsuit. The rights which the complaint seeks to vindicate, rather, are based on separate purchases of different products by each of the individual members. The restitution of these amounts to individual plaintiffs is not the restitution of a common fund.

*Crawford,* 267 F.3d at 766 (*quoting Gilman v. BHC Securities, Inc.,* 104 F.3d 1418 (2nd Cir.1997)).

In this case, Plaintiff and prospective Class Members held no joint title to any portion of AT & T's profits prior to the commencement of this lawsuit. The Complaint seeks to vindicate individual rights based on separate purchases of wireless services. Disgorgement of these amounts, whether phrased in terms of unjust enrich-ment or equitable restitution, is not the restitution of a common fund. *See Gilman,* 104 F.3d at 1426–28 (refusing to aggregate "order flow" payments of which plaintiffs sought disgorgement, where those payments were made to the defendant by individual plaintiffs in separate transactions).

Moreover, " '[a]bsent unusual circumstances, unjust enrichment remedies do not provide a generalized recovery of a fixed fund for the class. Instead, each plaintiff is entitled to the defendants' profits which resulted from the wrongdoing to that particular plaintiff.' " *Aetna I,* 54 F.Supp.2d at 1050 (quoting *Campbell v. General Motors Corp.,* 19 F.Supp.2d 1260, 1268 (N.D.Ala.1998)). "To the extent possible, disgorged funds should be apportioned among the individual claimants rather than being treated as a single collective right in which putative class members have an undivided interest." *Id.* (citation and internal quotations omitted). "While the damages are admittedly based on the defendants' profits, and not the plaintiffs' harm, each recovery is an individual right and constitutes an individual interest." *Id.* (citation and internal quotations omitted).

Because Plaintiff's claim for disgorgement is subject to the non-aggregation rule, Defendant's reliance on this theory to support the exercise of diversity jurisdiction fails.

## VI. ATTORNEY'S FEES AND COSTS

Plaintiff requests an award of fees and costs incurred in bringing her motion to remand. Pursuant to 28 U.S.C. 1447(c), an order remanding a case may require payment of just costs, including attorney's fees, in the discretion of the Court. An

award of costs and fees is entirely discretionary. It is unresolved in this Circuit whether a finding of bad faith is necessary to impose attorney's fees on remand. *Compare Moline Machinery, Ltd. v. Pillsbury Co.,* 259 F.Supp2d 892, 905–06 (D.Minn.2003)(denying request for fees where removal sought in good faith and for no improper purpose) with *Calloway v. Union Pac. R. Co.,* 929 F.Supp. 1280 (E.D.Mo.1996)(finding of bad faith not necessary to award attorney's fees on remand).

The Court exercises its discretion to decline to award attorney's fees and costs in this case. There is no indication that the removal was sought in bad faith. Although the Court rejected Defendant's arguments, the Court cannot say that Defendant lacked any colorable legal ground for removal.

### CONCLUSION

For the reasons herein stated,

IT IS THEREFORE ORDERED THAT Plaintiff's Motion to Remand (Docket Entry # 4) be, and it is hereby, GRANTED. This action is hereby remanded back to the state court from which it was removed. The Clerk of the Court is directed to take the appropriate action to facilitate the transfer.